1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANNETTE KELLY HEILMAN,                    No.  2:21-CV-0476-DMC

12              Plaintiff,

13        v.                                   <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                Defendant.
16

17

18              Plaintiff,[1] who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, ECF Nos. 7 and 12, this case is before the

21   undersigned as the presiding judge for all purposes, including entry of final judgment.  <u>See</u> 28

22   U.S.C. § 636(c); <u>see also</u> ECF No. 19 (minute order reassigning case to Magistrate Judge).

23   Pending before the Court are the parties' briefs on the merits, ECF Nos. 16 and 17.

24   / / /

25   / / /

26   / / /

27   _____

28        [1]     Plaintiff's last name is spelled "Heilman" in her complaint and on the docket, and
     "Heilmann" elsewhere in the record.

1

The Court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

For the reasons discussed below, the matter will be remanded for further proceedings.

## I.  THE DISABILITY EVALUATION PROCESS

To achieve uniformity of decisions, the Commissioner employs a five-step sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).  The sequential evaluation proceeds as follows:

> Step 1   Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied;

/ / /

2

| | | |
|---|---|---|
| Step 2 | | If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 3 | | If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted; |
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock

1   v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

2

3                    **II.  THE COMMISSIONER'S FINDINGS**

4            Plaintiff applied for social security benefits on May 24, 2016.  See CAR, 26.[2]  In

5   the application, Plaintiff claims disability began on April 28, 2014.  See id.  Plaintiff's claim was

6   initially denied.  Following denial of reconsideration, Plaintiff requested an administrative

7   hearing, which was held on October 25, 2018, before Administrative Law Judge (ALJ) Michael

8   A. Cabotaje.  In a November 27, 2018, decision, the ALJ concluded Plaintiff is not disabled based

9   on the following relevant findings:

10          1.     The claimant has the following severe impairments: degenerative
                   disc disease (DDD); meniscus tear of the left knee status post
11                 arthroscopy; degenerative joint disease (DJD) of the right shoulder;
                   carpal tunnel syndrome (CTS) of the right upper extremity; and
12                 chronic obstructive pulmonary disorder (COPD).

13          2.     The claimant does not have an impairment or combination of
                   impairments that meets or medically equals an impairment listed in
14                 the regulations.

15          3.     The claimant has the following residual functional capacity:
                   perform light work as defined in 20 CFR 404.1567(b) except she
16                 can frequently push and pull with the right upper extremity;
                   occasionally climb ramps and stairs; never climb ladders, ropes, or
17                 scaffolds; occasionally balance, stoop, kneel, crouch, and crawl;
                   occasionally reach overhead with the right upper extremity; and
18                 frequently reach otherwise with the right upper extremity. She
                   cannot work with concentrated exposure to fumes, dusts, gases, or
19                 other pulmonary irritants; and cannot work with concentrated
                   exposure to heavy moving machinery or unprotected heights.
20
            4.     Considering the claimant's age, education, work experience,
21                 residual functional capacity, and vocational expert testimony, the
                   claimant can perform past relevant work.
22
            See id. at 28-36.
23

24   After the Appeals Council declined review on August 26, 2019, this appeal followed.

25   / / /

26   / / /

27   _____

28   [2]      Citations are to the Certified Administrative Record (CAR) lodged on October 29,
     2021, ECF No. 9.

### III.  DISCUSSION

In their brief, Plaintiff makes the following arguments:

1.     The ALJ erred at Step 2 in finding that Plaintiff had a non-severe mental impairment, and therefore further erred in failing to consider Plaintiff's mental health impairments during the residual functional capacity analysis at Step 4;

2.     At Step 4, the ALJ failed to give proper weight to the medical opinion of Dr. Stanger, a treating physician; and

3.     The ALJ failed to give clear and convincing reasons for rejecting Plaintiff's testimony at Step 4.

See ECF No. 16.

The Court finds each of Plaintiff's arguments persuasive for the reasons addressed below.

### A.     <u>Severity Determination</u>

To qualify for benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling (SSR) 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient. See id.

/ / /

/ / /

5

At Step 2 of the sequential analysis, the ALJ considered the severity of Plaintiff's various impairments. See CAR 28-31. In doing so, the ALJ identified a number of physical impairments which were found to be severe. See id. at 28-29. The ALJ, however, found Plaintiff's mental impairments to be non-severe. See id. at 29-31. The ALJ concluded:

> The claimant's medically determinable mental impairments of adjustment disorder and panic disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.
>
> In making this finding, I considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix I). These four areas of mental functioning are known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering, or applying information. In this area, the claimant has no limitation. Treatment notes generally reflect that the claimant exhibited a normal memory (Ex. 1F/12, 28; 12F/12). In addition, she could perform many activities of daily living requiring some capacity to remember and apply information, such as performing personal care, preparing meals, doing household chores, caring for her dog, driving, and shopping (Testimony; Ex. 4E/6, 8; 11E/5).
>
> The next functional area is interacting with others. In this area, the claimant has no limitation. Treatment notes generally reflect an appropriate mood and affect without reference to difficulties interacting with medical staff during office visits (Ex. 1F/28; 12F/9). In addition, she could grocery shop in stores, go to the dog park, go to the library, spend time with others, and live with others, which suggests an intact capacity for basic social interaction (Testimony; Ex. 4E; 1F/24).
>
> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. The claimant reported difficulties focusing (Testimony). However, the record generally reflects that she was active, alert, and oriented with intact concentration upon exam (Ex. 3F/22; 4F/6). In addition, she could prepare meals, do puzzles, read, sew, drive, manage funds, and handle her own medical care, which suggests some capacity to focus and persist (Testimony; Ex. 4E; 11E).
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. Treatment notes generally reflect an appropriate mood and affect without reference to difficulties behaving appropriately with medical staff during office visits (Ex. 1F/28; 12F/9). In addition, she could perform many activities of daily living including personal care, preparing meals, performing household chores, going out alone, grocery shopping, driving, and attending medical appointments, which indicates an ability to manage oneself (Testimony; Ex. 4E/7).

///

///

6

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404.1520a(d)(l)).

CAR 29.

In making this finding, the ALJ further noted:

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

CAR 30.

The ALJ then evaluated medical opinion evidence discussed above from Sabrina Correa, Psy.D., John Kiefer, Psy.D., and state agency psychological consultants, Pamela Green, Ph.D., and Julie Bruno, Psy.D. See id. The ALJ afforded "partial weight" to Dr. Correa's opinions and "little weight" to the other opinions. See id. at 30-31.

Plaintiff argues that the ALJ erred in finding at Step 2 that Plaintiff only had a non-severe mental health impairment. See ECF No. 16, pg. 23. Specifically, she points to the medical opinions of Drs. Correa and Kiefer, as well as the two state agency psychologists, Drs. Green and Bruno. See id. at 23-36. According to Plaintiff, though each opinion indicates the existence of a mental impairment, the ALJ improperly rejected all these opinions at Step Two of the sequential analysis. See id. at 23-26; see also, CAR, 28-31. Plaintiff argues that all these doctors opined as to limitations that were more than minimal and that by rejecting the opinions, the ALJ improperly found Plaintiff's mental impairments to be non-severe. See ECF No. 16, pg. 24. For the reasons discussed below, the Court agrees.

As to Dr. Correa, Plaintiff's treating psychologist, The ALJ stated:

. . . I accord partial weight to the opinion of treating psychologist, Sabrina Correa, PsyD, provided on February 17, 2017 (Ex. 11F). Weight is given because Dr. Correa is a specialist in her field and has a treating relationship with the claimant. In addition, her findings that the claimant could understand, remember, and carry out simple and complex

instructions, as well as interact appropriately with others, are consistent with the record, which generally showed a normal mood, affect, and memory and an ability to perform many independent activities of daily living (Testimony; Ex. 4E; 11E; 1F/12, 28; 12F/12). However, no more than partial weight is given as she has a relatively short treating history with the claimant and has only seen the claimant once per month since her first exam in December 2016. Additionally, her findings that the claimant would have fair limitations maintaining concentration, attention, and persistence, maintaining a regular schedule and attendance, and responding to changes in a work setting, as well as a poor ability to complete a normal workday or workweek is not consistent with the claimant's reported level of activity, which includes an ability to perform personal care, prepare meals, perform household chores, shop, drive, and care for her husband (Testimony; Ex. 4E; 11E). Dr. Correa also provides little explanation to support these limitations. Accordingly, her opinion is given no more than partial weight.

Id.

As to Dr. Kiefer, the state agency examining psychologist, the ALJ stated:

I accord little weight to the opinion of psychological consultative examiner, John Kiefer, PsyD, provided on July 26, 2016 (Ex. 4F). Little weight is given as Dr. Kiefer is not a treating source and conducted only a one-time exam. In addition, his limitations are vague and do not define his use of the terms "good" and "fair." Furthermore, his indication that there is a moderate likelihood of the claimant emotionally deteriorating in the work environment is not consistent with the minimal evidence of mental health treatment found in the record or her many reported activities of daily living including performing household chores, driving, shopping, and caring for her husband (Testimony; Ex. 4E; 11E). As such, this opinion is given little weight.

CAR 30-31.

As to opinions from state agency non-examining psychological consultants, Drs. Green and Bruno, the ALJ stated:

I accord little weight to the opinions of the State Agency psychological consultants, Pamela D. Green, PhD at the initial level provided on August 16, 2016 and Julie Bruno, PsyD at the reconsideration level provided on December 15, 2016 (Ex. 1A; 3A). Little weight is given as these consultants are non-examining, non-treating sources. In addition, their opinions are not consistent with the record, which showed minimal mental health treatment, no hospitalizations or emergency care, and an ability to perform many reported activities of daily living despite any symptoms (Testimony; Ex. 4E; 11E). Furthermore, while they accorded great weight to the opinion of the psychological consultative examiner, Dr. Kiefer, their limitations to simple, routine tasks are not consistent with Dr. Kiefer's

/ / /

/ / /

8

opinion that the claimant has a good capacity to understand, remember, and carry out both simple, as well as detailed and complex, instructions (Ex. 4F/7).

CAR 30.

Dr. Correa opined that Plaintiff has major depressive disorder and chronic pain. See CAR 539. She also indicated an anxious, depressed, and fearful mood, as well as auditory and visual hallucinations. See id. at 540. Finally, Dr. Correa concluded that Plaintiff had only fair ability to maintain concentration, to perform activities within a schedule and maintain regular attendance, and to respond appropriately to changes in a work setting. See id. at 542. "Fair" is defined in Dr. Correa's opinion as an impaired capacity to perform the indicated activity, but that the extent of impairment would require further investigation. Id. Dr. Correa also stated that Plaintiff had a poor ability to complete a normal workday or workweek without interruptions from psychologically based symptoms. Se id. "Poor" is defined as not able to usefully perform or sustain the activity. Id. The ALJ gave these opinions "partial weight" because Dr. Correa's treating relationship was short, they are inconsistent with Plaintiff's daily activities, and Dr. Correa provided little explanation to support her conclusions. See CAR 30.

Dr. Kiefer's opinion indicates that Plaintiff has a fair ability to accept instruction from a supervisor, interact with co-workers, sustain a normal routine without supervision, complete a normal workday or workweek, and deal with changes in the workplace. See id. at 503. Dr. Kiefer opined that there was a moderate likelihood that Plaintiff would emotionally deteriorate in the work environment. Id. The ALJ gave these opinions "little weight" because Dr. Kiefer was not a treating source, the doctor's limitations are vague because terms such as "good" and "fair" are not defined, and the opinions are inconsistent with the scant mental health treatment record. See id. at 30-31.

Dr. Green identified moderate limitations in the following areas: ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms at a consistent pace without unreasonable rest. See id. at 88-89. Dr. Bruno found that Plaintiff was moderately limited in their ability to carry out detailed instructions and to

1  maintain attention and concentration for extended periods.  See id. at 106.  The ALJ gave these

2  opinions "little weight" because Drs. Green and Bruno did not examine Plaintiff, the opinions are

3  inconsistent with the record of minimal mental health treatment, and the opinions are inconsistent

4  with Dr. Kiefer's opinion.  See id. at 30.

5          Each of these opinions identified impairments limiting Plaintiff's ability to

6  maintain concentration and to function properly for the duration of a workday or workweek.

7  Regarding the Plaintiff's ability to maintain pace, the ALJ stated:

8          The third functional area is concentrating, persisting, or maintaining
           pace. In this area, the claimant has a mild limitation. The claimant
9          reported difficulties focusing (Testimony). However, the record
           generally reflects that she was active, alert, and oriented with intact
10         concentration upon exam (Ex. 3F/22; 4F/6). In addition, she could
           prepare meals, do puzzles, read, sew, drive, manage funds, and
11         handle her own medical care, which suggests some capacity to
           focus and persist (Testimony; Ex. 4E; 11E).
12
           CAR 29.
13

14         First, the ALJ is incorrect in stating that exhibits 4E and 11E indicate that the

15  Plaintiff could drive.  See id. at 246, 287.  Even ignoring that factual error, those exhibits indicate

16  issues with concentration, and that Plaintiff's cooking, shopping, and cleaning mostly happen in

17  20-40-minute intervals.  See id. at 286-289.  This does not show an ability to persist or maintain

18  concentration throughout a workday.  See id. at 286-289.  Additionally, that Plaintiff was active,

19  alert, and oriented during isolated exams, is not evidence that contraindicates the finding of a

20  severe impairment in the ability to complete a workweek or workday.

21         It is apparent that significant evidence exists in the record that Plaintiff had more

22  than a non-severe mental health impairment.  In particular, the opinions discussed above indicate

23  more than minimal mental health limitations affecting Plaintiff's ability to work.  At Step 2, the

24  only question is whether Plaintiff has provided evidence of more than minimal limitations.  Here,

25  the Court finds she had.  Whether the specific limitations opined by Drs. Correa, Kiefer, Green,

26  and Bruno are to be afforded weight in determining Plaintiff's residual functional capacity is a

27  question for Step 4.  Thus, the ALJ's evaluation of the weight to be afforded these opinions at

28  Step 2 is misplaced.  Because Plaintiff has shown evidence of more than minimal limitations on

1  her ability to perform the mental demands of work, the ALJ erred in determining Plaintiff's

2  mental impairments are non-severe.  The matter must be remanded to the Commissioner to allow

3  for a proper severity determination which takes into account the more-than-minimal limitations

4  opined by Drs. Correa, Kiefer, Green, and Bruno.

5        **B.**    **Evaluation of Medical Opinions**

6            "The ALJ must consider all medical opinion evidence."  Tommasetti v. Astrue,

7  533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not

8  explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir.

9  2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical

10  opinion over another.  See id.

11            Under the regulations, only "licensed physicians and certain qualified specialists"

12  are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue,

13  674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on

14  an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it

15  rests on his own independent examination of the claimant."  Tonapetyan v. Halter, 242 F.3d 1144,

16  1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute

17  substantial evidence when the opinions are consistent with independent clinical findings or other

18  evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social

19  workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec.

20  Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants

21  also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016).

22  Opinions from "other sources" such as nurse practitioners, physician assistants, and social

23  workers may be discounted provided the ALJ provides reasons germane to each source for doing

24  so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874

25  F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance

26  when opinions from "other sources" may be considered acceptable medical opinions).

27  / / /

28  / / /

1        For all claims, as here, filed before March 27, 2017, ALJs are bound by

2   regulations and case law requiring ALJs to give physicians' opinions different weights, depending

3   on the relationship between the physician and the claimant.  See 20 C.F.R §§ 404.1527(c) &

4   416.920(c); Garrison v. Colvin, 759 F.3d 995, 1017-18 (9th Cir. 2014).  This rule is known as the

5   treating physician rule.  The weight given to medical opinions depends in part on whether they

6   are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81

7   F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

8   professional, who has a greater opportunity to know and observe the patient as an individual, than

9   the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

10  Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the

11  opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th

12  Cir. 1990).

13       In addition to considering its source, to evaluate whether the Commissioner

14  properly rejected a medical opinion in a claim filed before March 27, 2017, the Court considers

15  whether: (1) contradictory opinions are in the record; and (2) clinical findings support the

16  opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining

17  medical professional only for "clear and convincing" reasons supported by substantial evidence in

18  the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is

19  accorded superior weight, if it is contradicted by an examining professional's opinion which is

20  supported by different independent clinical findings, the Commissioner may resolve the conflict.

21  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

22       A contradicted opinion of a treating or examining professional may be rejected

23  only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d

24  at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the

25  facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

26  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

27  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

28  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

1    without other evidence, is insufficient to reject the opinion of a treating or examining

2    professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

3    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

4    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

5    also Magallanes, 881 F.2d at 751.

6             According to Plaintiff, the ALJ erred at Step 4 in evaluating the opinions offered

7    by her treating physician, Dr. Stanger.  As to Dr. Stanger, the ALJ stated:

> I accord little weight to the opinions of Jennifer K. Stanger, MD provided
> on December 7, 2016 and February 27, 2017 (Ex. 10F; 13F). Little weight
> is given as her extreme limitations are not consistent with the record.
> Despite some pain, decreased range of motion, and an antalgic gait at
> times, physical exams also generally showed intact strength, intact
> sensation, normal reflexes, no edema, and little references to an inability
> to ambulate effectively (Ex. 3F/18-19; 6F/6; 14F/1). Additionally, she
> could perform a wide range of activities despite her symptoms including
> household chores, grocery shopping, feeding and walking her dog, and
> caring for her husband, which show a greater level of functioning than
> opined by Dr. Stanger (Testimony; Ex. 4E; 11E). Furthermore, Dr.
> Stanger does not provide any explanation for the differences and greater
> limitations found in her February 2017 opinion in comparison to her other
> opinion given just three months prior. Finally, opinions regarding issues of
> disability are reserved for the Commissioner of the Social Security
> Administration and are not considered medical opinions under the
> regulations.

17           CAR 35.

18           The ALJ gave "little weight" to Dr. Stanger's opinion for four reasons: (1) the

19   limitations described by Dr. Stanger are not consistent with the record, (2) Plaintiff's daily

20   activities showed a greater level of function than indicated by Dr. Stanger, (3) Dr. Stanger did not

21   explain the inconsistencies between her own opinions, and (4) opinions regarding issues of

22   disability are reserved for the commissioner.  See id.

23           1.    Inconsistencies with Medical Record

24           As to purported inconsistencies with the medical record, the ALJ cites to three

25   exhibits: 3F, 6F, and 14F.  See CAR 35.  Exhibit 3F at pages 18 and 19 indicates normal range of

26   motion and strength of Plaintiff's extremities, but also indicates pain elicited by head and neck

27   motion, and fluid in some of Plaintiff's joints.  See id. at 452-53.  This also appears be a shoulder

28   and neck exam, and it is unclear how it shows that Plaintiff was able "to ambulate effectively."

1    Id. at 35.  Exhibit 6F includes foot and ankle exam results, which do not seem to address

2    Plaintiff's mobility.  See id. at 519.  Exhibit 14F is a study of Plaintiff's nerve system responses

3    in her hands.  See id. at 603-604.  It references symmetrical 5/5 hand strength, but otherwise does

4    not address Plaintiff's reflexes, edema, or mobility.  See id.  None of the cited exhibits seems to

5    indicate the kind of inconsistency with the objective record that would constitute legitimate

6    evidence sufficient to give "little weight" to the medical opinion of a treating physician.

7                        2.    Daily Activities

8            The ALJ considered Plaintiff's daily activities in rejecting Dr. Stanger's opinion,

9    citing exhibits 4E and 11E which are both reports filled out by Plaintiff's husband.  See id.

10   Exhibits 4E and 11E do indicate that Plaintiff can perform some daily tasks, including cooking,

11   shopping, cleaning, caring for a pet, and personal hygiene.  See CAR, 243-250, 284-290.

12   However, these exhibits also indicate limitations on Plaintiff's ability to function in a workplace.

13   Exhibit 4E states that Plaintiff has difficulty climbing stairs, requires help donning socks and

14   shoes, can only walk 100 yards before needing a 1-2-minute rest, and uses a cane.  See id. at 243-

15   250.  Exhibit 11E states that she cannot sit longer than 10-15 minutes, stand longer than 20

16   minutes, cook meals taking longer than 20 or 30 minutes to prepare, read or color for more than

17   10-15 minutes at a time, and that she can only walk 2-3 blocks without rest.  See id. at 284-290.

18   Exhibit 11 also states that she has difficulty following spoken instructions, is anxious about going

19   to new places by herself, that changes in routine make her anxious, and that stress induces

20   migraine headaches and loss of appetite.  See id.  Because this is not consistent with the ability to

21   spend a substantial part of the day engaged in physical functions in a work setting, reference to

22   Plaintiff's daily activities is an inadequate reason to reject Dr. Stanger's opinion.

23                        3.    Internal Inconsistencies within the Doctor's Opinions

24           The ALJ rejected Dr. Stanger's opinions because they are inconsistent with each

25   other. The ALJ refers to exhibits 10F and 13F in making this claim, which are both evaluation

26   questionnaires filled out by Dr. Stanger.  Id. at 35.  There are two identifiable inconsistencies

27   between the exhibits.  First, in 13F, Dr. Stanger placed greater restrictions on Plaintiff's ability to

28   use her hands.  See id. at 601-602, 536-537.  These greater restrictions are accompanied by a

1   positive Phalen's test as objective evidence that Plaintiff has carpal tunnel syndrome.  Id. at 601.

2   Second, Dr. Stanger also opines that Plaintiff would need to lie down during the workday in 13F,

3   while answering that question in the negative in 10F.  On their face, neither of these differences

4   between Dr. Stanger's opinions seem to be so inexplicably inconsistent that the opinion evidence

5   should be discredited.

6                    4.      Determination of Ultimate Issue of Disability

7            While the "administrative law judge is not bound by the uncontroverted opinions

8   of the claimant's physicians on the ultimate issue of disability, [] he cannot reject them without

9   presenting clear and convincing reasons for doing so."  Matthews v. Shalala, 10 F.3d 678, 680

10  (9th Cir. 1993) (quoting Montijo v. Sec'y of Health and Hum. Servs., 729 F.2d 599, 601 (9th Cir.

11  1984)).  Here, the ALJ has specified no reason for rejecting Dr. Stanger's opinion on the issue of

12  disability beyond the inadequate reasons enumerated above.  While the Commissioner is certainly

13  correct that the ALJ properly rejected Dr. Stanger's opinion on the ultimate question of disability,

14  as discussed above the Court finds the ALJ's other reasons for rejecting Dr. Stanger's opinions to

15  not be supported by the record as a whole or correct analysis.

16           **C.      Evaluation of Plaintiff's Statements and Testimony**

17           The Commissioner determines the weight to be given to a claimant's own

18  statements and testimony, and the court defers to the Commissioner's discretion if the

19  Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94

20  F.3d 520, 522 (9th Cir. 1996).  An explicit finding must be supported by specific, cogent reasons.

21  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.

22  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify

23  what testimony is not afforded weight and what evidence undermines the testimony.  See id.

24  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's

25  reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also

26  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504

27  F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

28  / / /

1       If there is objective medical evidence of an underlying impairment, the

2   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5           The claimant need not produce objective medical evidence of the
        [symptom] itself, or the severity thereof.  Nor must the claimant
6           produce objective medical evidence of the causal relationship
        between the medically determinable impairment and the symptom.
7           By requiring that the medical impairment "could reasonably be
        expected to produce" pain or another symptom, the Cotton test
8           requires only that the causal relationship be a reasonable inference,
        not a medically proven phenomenon.

9
        80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
10          Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

11      The Commissioner may, however, consider the nature of the symptoms alleged,

12  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13  947 F.2d at 345-47.  In weighing a claimant's statements and testimony, the Commissioner may

14  also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other

15  inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to

16  follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

17  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18  Smolen, 80 F.3d at 1284 (citations omitted).

19      In this case, the ALJ considered Plaintiff's statements and testimony at Step 4 in

20  evaluating Plaintiff's residual functional capacity.  See CAR 32-34.  The ALJ began by

21  summarizing Plaintiff's statements and testimony as follows:

22          The claimant alleges disability due to the combined effects of multiple
        physical impairments. At the hearing, the claimant testified that she
23          experiences constant neck, back, and left knee pain. She also indicated
        swelling in her left knee, as well as difficulties grasping, writing, and
24          using her right hand (Testimony). Due to her impairments, the claimant
        reported that she could only sit for 10 to 15 minutes, stand up to 30
25          minutes with a non-prescribed cane, walk two to three blocks, and lift up
        to eight pounds (Testimony; Ex. 13E/7).
26
        CAR 32.
27

28  / / /

1        The ALJ then addressed Plaintiff's statements and testimony in the context of specific

2   impairments:

3        With regard to her musculoskeletal impairments, the record supports that
         the claimant could perform a range of light exertional work. The claimant
4        reported that she underwent lumbar decompression surgery in 2004 before
         the period of adjudication (Ex. 12F/18). Consistent with these reports, an
5        x-ray of the lumbar spine in September 2015 showed an anterior fusion at
         L4-L5 and mild multilevel degenerative changes of the lumbar spine (Ex.
6        12F/54). Similarly, an x-ray of the lumbar spine in May 2016 showed
         stable postoperative changes, as well as unchanged moderately advanced
7        degenerative disc and bone disease at L3-4 and, to a much lesser degree, at
         L5-S1 (Ex. 12F/48). However, a CT scan of the lumbar spine in June 2016
8        revealed marked narrowing of the L3-4 lumbar disc space and screws at
         L4 extending beyond the vertebral body into the lumbar spinal canal (Ex.
9        5F/4).

10       With respect to her cervical DDD, an x-ray of the cervical spine in April
         2016 showed mild to moderate narrowing confined to the C4-5 and C5-6
11       disc space and minor hypertropic spur formation at C4, C5, and C6 (Ex.
         12F/51). An MRI of the cervical spine in June 2016 also showed mild
12       spondylitic changes primarily at C4-5 and C5-6; mild spinal and
         neuroforaminal narrowing at C4-5 and C5-6; small to moderate-sized
13       bilateral neuroforaminal disc herniation protrusion and osteophyte
         complexes at C4-5 and C5-6; and a tiny right paracentral disc
14       protrusion at C6-7, as well as a tiny left neuroforaminal disc protrusion at
         C7-T1 (Ex. 5F/7-8).
15
         In terms of her left knee, an x-ray in March 2016 showed mild symmetric
16       narrowing at all three left knee joint compartments, minor hypertropic
         spur formation confined to the patellofemoral compartment, and a small
17       left knee joint effusion (Ex. 3F/60). However, an MRI in April 2016
         showed a tear of the junction of the posterior horn and body of the medial
18       meniscus; grade two or three chondral thinning involving the
         weightbearing aspect of the left medial femoral condyle; grade three
19       chondral thinning and delamination involving the articular cartilage of the
         central portion of the left patella; grade three chondral fissuring involving
20       the central portion of the left trochlea, left quadriceps enthesopathy; and
         moderate left knee joint effusion (Ex. 5F/9-10). In addition, the record
21       shows that the claimant subsequently underwent a left knee arthroscopy
         with loose body removal, partial medial meniscectomy, and extensive
22       synovectomy in May 2016 (Ex. 3F/36).

23       As for her DJD and CTS, an x-ray of the right shoulder in March 2016
         was unremarkable (Ex. 12F/52). However, an MRI of the right shoulder in
24       June 2016 revealed subchondral cysts in the humeral head, which were
         likely sequelae of an old injury; mild acromioclavicular joint arthritis
25       and bursitis; and mild insertional tendinosis and a small articular surface
         insertional partial tear supraspinatus and infraspinatus (Ex. 5F/5-6). A
26       nerve conduction study of the right upper extremity in April 2017 also
         revealed evidence of median neuropathy at the carpal tunnel, which
27       was classified as mild demyelinating neuropathy preferentially affecting

28   / / /

17

sensory fibers (Ex. 14F/2). It also showed a suggestion of mild ulnar sensory nerve irritation distally at the wrist at Guyon's canal (Ex. 14F/2).

CAR 32-33.

The ALJ added:

While the claimant's allegations find some support in her diagnostic imaging tests, the record does not support the intensity, persistence, and limiting effects of the claimant's symptoms as alleged based on her physical examinations, treatment history, activities of daily living, and the longitudinal record as a whole. As such, I find that the claimant is able to perform work related activities at the aforementioned residual functional capacity.

Physical examinations during the period of adjudication generally showed intact strength, intact sensation, normal reflexes, and no edema despite some tenderness and decreased range of motion at times (Ex. 3F/18-19; 6F/6; 14F/1). Although she testified to difficulties using her right hand, she also demonstrated 5/5 strength in her arms with normal muscle tone, no atrophy, and intact sensation at her fingertips (Ex. 14F/1). While she demonstrated an antalgic gait and limp with use of a non-prescribed cane at times, treatment notes also often do not reference gait abnormalities during office visits, consistent use of an assistive device for ambulation, or indications of an inability to ambulate effectively even with her cane (Ex. 1F/22; 12F/5).

In terms of therapy, the record generally reflects little treatment after early April 2017. Prior to that time, progress notes generally show conservative treatment for her DDD, DJD, and CTS including use of medication and a wrist brace with some improvement in pain (Ex. 1F/24; 12F/2). While it is noted that the claimant underwent left knee arthroscopic surgery in May 2016, by July 2016, she reported doing well since her surgery (Ex. 12F/12, 18). Likewise, subsequent progress notes reflect little evidence of ongoing left knee related symptoms (Ex. 6F/6; 12F/5, 12). Furthermore, despite reporting debilitating pain, it is noted that the record generally reflects little evidence of frequent emergency care, regular physical or chiropractic therapy, or other forms of alternative treatment for her pain during the relevant period, which suggests that her symptoms are manageable under her current conservative regimen.

Therefore, based on the medical evidence of record, the evidence does not reveal limitations beyond those outlined in the residual functional capacity finding above. However, in consideration of her DDD, DJD of the right shoulder, CTS of the right upper extremity, and meniscus tear of the left knee, I have limited the claimant to a range of light work with additional postural and environmental limitations. Additionally, to further accommodate symptoms from her DJD of the right shoulder and CTS of the right upper extremity, she has also been given pushing, pulling, and reaching limitations. It is noted that while I have found the claimant's CTS of the right upper extremity to be severe when viewing the evidence in the light most favorable to the claimant, the record reflects that she nevertheless maintained 5/5 strength in her arms with normal muscle tone, no atrophy, and intact sensation at her fingertips. Additionally, she could

perform a wide range of activities including driving, cleaning, preparing meals, sewing, and coloring in books, which indicates a substantial level of functioning in the hands and wrists (Ex. 4E; 11E; 14F/1). Accordingly, while I have accommodated symptoms from her CTS of the right upper extremity by providing additional pushing, pulling, and reaching limitations, I find that no additional manipulative limitations are warranted.

As for her COPD, the claimant generally made little complaints of symptoms with any consistency during the period at issue. While she reported a cough and exhibited decreased breath sounds on occasion, her respiratory exams were generally normal and showed normal breath sounds and lungs clear to auscultation (Ex. 1F/22; 3F/22; 12F/15). Additionally, she reported an improvement with medication (Ex. 1F/27). Furthermore, it is noted that the claimant continued to smoke, which does not support the severity of symptoms as alleged (Ex. 1F/11; 12F/14). Accordingly, while symptoms from her COPD have been considered, they have been adequately accommodated by restricting her exposure to fumes, dusts, gases, or other pulmonary irritants.

In addition to the medical evidence, other factors in the claimant's file are inconsistent with her allegations of disability and suggest a greater level of functioning than claimed. The claimant could perform many activities of daily living despite her impairments. While she reported requiring some assistance at times, she could nevertheless perform personal care, do household chores, and grocery shop (Ex. 4F/5). In addition, she could independently prepare meals, feed and walk her dog, drive, and care for her husband (Testimony; Ex. 4E; 1 1E; 1F/17). The physical and mental abilities required in order to perform these activities are not fully consistent with the claimant's allegations of disability and indicate that she could perform activities consistent with a range of light work despite her symptoms. Furthermore, it is noted that the claimant testified to applying and interviewing for jobs since her alleged onset date, which demonstrates her own belief that she retains the capacity for some work related activities. As such, I find that the residual functional capacity adequately encompasses the claimant's functional limitations based on the medical and other evidence of record and the claimant's reports.

CAR 33-34.

Plaintiff argues that the ALJ wrongfully rejected her statements testimony with regard to her ability to sit, stand, work, lift, and focus. See ECF No. 16, pgs. 26-27. Plaintiff points to two main issues with the ALJ's rejection of Plaintiff's testimony: (1) the ALJ's consideration of Plaintiff's daily activities, and (2) the ALJ's consideration of the fact that Plaintiff searched for a job after their initial application for disability benefits. See id. at 26-28. As discussed below, the Court agrees and will remand for further proceedings to evaluate Plaintiff's statements and testimony.

///

1          1.          Attempts to Find Employment

2          Addressing the second claim first, the ALJ erred in using the Plaintiff's job

3   applications as evidence that she was not more than minimally impaired.  According to the ALJ,

4   Plaintiff applied for jobs since the alleged onset date.  The ALJ does not, however, state that

5   Plaintiff applied for full-time employment, which would suggest that Plaintiff herself believed her

6   impairments to not be disabling.  To the extent Plaintiff sought only limited work at less than a

7   full-time competitive basis, reference to employment efforts do not necessarily undermine

8   Plaintiff's statements and testimony as to disabling limitations.

9          2.          Daily Activities

10          Regarding reliance on a claimant's daily activities to discount testimony of

11   disabling pain, the Social Security Act does not require that disability claimants be utterly

12   incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

13   repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

14   does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

15   Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

16   Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

17   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

18   restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

19   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

20   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

21   activities are not easily transferable to what may be the more grueling environment of the

22   workplace, where it might be impossible to periodically rest or take medication").  Daily

23   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

24   his day engaged in pursuits involving the performance of physical functions that are transferable

25   to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

26   before relying on daily activities to discount a claimant's pain testimony.  See Burch v. Barnhart,

27   400 F.3d 676, 681 (9th Cir. 2005).

28   / / /

1    In this case, the ALJ does not tie any of Plaintiff's daily activities to an ability to

2    spend a substantial part of the day working.  See CAR 34.  To the contrary, it appears that

3    Plaintiff's ability to engage in daily activities is limited.  For example, Exhibits 4E and 11E

4    indicate that Plaintiff cannot drive, in direct opposition to the ALJ's finding here.  See id. at 246,

5    287.  Exhibits 4E and 11E also indicate that Plaintiff is substantially limited in their ability to

6    perform the activities indicated by the ALJ as evidence of her non-disability.  She can only pay

7    attention for 20 minutes, can only walk 2-3 blocks at a time, only shops for 30-45 minutes, and

8    she only prepares meals that take less than 30 minutes to make.  Id. at 286-289.  She only cleans

9    in intervals of 20-30 minutes as well.  Id. at 286.  Because this intermittent activity does not

10   comport with the ability to perform work throughout the day on a full-time competitive basis, the

11   ALJ has erred in citing daily activities as a reason to reject Plaintiff's testimony and statements.

12

13                                      **IV.  CONCLUSION**

14         For the foregoing reasons, this matter will be remanded under sentence four of 42

15   U.S.C. § 405(g) for further development of the record and/or further findings addressing the

16   deficiencies noted above.

17         Accordingly, IT IS HEREBY ORDERED that:

18         1.    Plaintiff's motion for summary judgment (ECF No. 16) is granted;

19         2.    Defendant's motion for summary judgment (ECF No. 17) is denied;

20         3.    The Commissioner's final decision is reversed and this matter is remanded

21   for further proceedings consistent with this order; and

22         4.    The Clerk of the Court is directed to enter judgment and close this file.

23

24   Dated:  July 29, 2022

25   _____
     DENNIS M. COTA
26   UNITED STATES MAGISTRATE JUDGE

27

28

                                            21